UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

QSI HOLDINGS, INC. and
QUALITY STORES, INC.,

              Plaintiffs-Appellants,              Case No. 1:06-CV-876
                                                         Bankruptcy Adversary No.
03-88912

v.                                               HON. JANET T. NEFF

CHERYL A. ALFORD et al.,

              Defendants-Appellees.
_____/

## OPINION

Plaintiffs Q.S.I. Holdings, Inc. and Quality Stores, Inc. appeal from an order of the bankruptcy court granting summary judgment in favor of defendants in a post-judgment adversary proceeding brought by plaintiffs. *In re Quality Stores, Inc.*, 355 B.R. 629 (Bankr. W.D. Mich. 2006). Plaintiffs sought avoidance of payments made to defendants, former shareholders of the debtor Quality Stores, Inc., in a leveraged buy-out[1] (LBO) of Quality Stores by Central Tractor and Farm Country, Inc. and its affiliate, CT Holdings, Inc. The bankruptcy court concluded that the LBO payments to defendants were "settlement payments" made by a "financial institution" under

---

[1] "A 'leveraged buyout' occurs when a group of investors acquires the stock of a company with borrowed money that is secured by the assets of the company to be purchased." The debt is subsequently repaid with money generated by the acquired company's operations or assets. The new debt creates a financial burden on the acquired company and limits its ability to secure additional financing to survive an economic downturn, which in turn can force the new company into bankruptcy, even as a result of a small decline in cash flow. 19 FORDHAM URB. L.J. 87, 87 n.1 (1991).

11 U.S.C. § 546(e) of the Bankruptcy Code,[2] and therefore were exempt from avoidance in bankruptcy.  For the reasons that follow, this Court affirms the decision of the bankruptcy court.

## I. Facts

The bankruptcy court set forth the uncontested facts for purposes of the motion for summary judgment.  Those underlying facts are not at issue on appeal and are adopted by this Court as follows:

> Quality [Stores] was a privately held corporation that operated a chain of retail stores specializing in agricultural and related products.  In 1999, Quality and certain of Quality's principal shareholders entered into a merger agreement with Central Tractor Farm and Country, Inc. ("Central Tractor") and its parent company, CT Holdings, Inc. (collectively the "CT Parties").  Pursuant to the agreement, Quality was to merge with and into Central Tractor, with the surviving entity changing its name to Quality Stores, Inc.  The agreement also called for Quality's shareholders to be paid, in cash or stock, for their respective equity interests.  The assets of both Quality and Central Tractor were pledged as collateral for the loan that was obtained and partially utilized to pay the Quality shareholders.
>
> The total purchase price for the LBO was approximately $208 million.  Of this amount, Quality's shareholders were to receive $111.5 million in cash with $91.8 million of stock in CT Holdings, Inc.  Central Tractor also agreed to assume and pay $42.1 million of Quality's existing indebtedness.
>
> The Quality LBO involved both individual shareholders and company employees who were shareholders by virtue of their participation in Quality's Employee Stock Ownership Trust ("ESOT").  To effectuate the securities transaction contemplated by the LBO, the CT Parties made a $111.5 [million] cash payment to their exchange agent, HSBC Bank USA ("HSBC Bank").  HSBC Bank collected the shares of Quality stock from individual shareholders.  It then transferred the securities to the CT Parties and distributed the cash, or shares in CT Holdings, Inc., to the individual shareholders.

---

[2] The court noted that the Bankruptcy Code is contained in 11 U.S.C. §§ 101-1330 and that the 2005 amendments to the Code, commonly referred to as "BAPCPA," were inapplicable to this adversary proceeding.  *In re Quality Stores, Inc.*, 355 B.R. at 631 n.1.  The parties do not contend otherwise on appeal.

For the ESOT shareholders, many of whom were lesser paid and mid-level Quality employees, the settlement process involved one additional step. Most of the ESOT stock was held by the ESOT trustee, LaSalle Bank. LaSalle Bank tendered the shares of Quality stock to HSBC Bank and received the cash consideration.[2] The ESOT was eventually terminated and the funds were distributed by LaSalle Bank to the ESOT participants.

As a result of the merger, Quality incurred substantial integration costs. The merged company also implemented a costly expansion plan which aggressively contemplated the opening of twenty-five to fifty new stores each year. These business decisions, and others, contributed to continuing financial difficulties which eventually led a group of petitioning creditors to file an involuntary bankruptcy petition against Quality during October 2001. In response, before an order for relief was entered, Quality filed a voluntary petition under chapter 11 on November 1, 2001.

The Plaintiffs filed this fraudulent conveyance action on October 31, 2003. The complaint, as amended, alleges that the Defendants gave less than reasonably equivalent value when they tendered their Quality stock for cash as part of the LBO. The complaint further alleges that the LBO left Quality with unreasonably small capital and caused it to incur debts beyond its ability to pay. The Plaintiffs seek to avoid and recover the LBO transfers as constructively fraudulent conveyances pursuant to 11 U.S.C. § 544, § 550, and the Michigan Uniform Fraudulent Transfer Act, Mich. Comp. Laws Ann. §§ 566.31 *et seq*. The Defendants' motions for summary judgment assert that the LBO transfers were settlement payments made by a financial institution. Therefore, the Defendants seek dismissal of this adversary proceeding because they contend that the transfers are exempt from avoidance under § 546(e).

---

[2] LaSalle Bank determined that it was in the best interests of the ESOT participants to receive cash, rather than shares in CT Holdings, Inc. Presumably, this was a decision that LaSalle Bank could legally make.

*In re Quality Stores, Inc.*, 355 B.R. at 631-632.

Following a thorough analysis of the relevant statutes and decisions from our sister circuits, the bankruptcy court granted the moving defendants' motions for summary judgment. *Id*. at 632-636. Further, because the § 546(e) defense applied equally to all defendants in the adversary

3

proceeding, the court sua sponte granted summary judgment in favor of the nonmoving defendants. *In re Quality Stores, Inc.*, 355 B.R. at 636.

## II. Standard of Review

On appeal to this Court from a bankruptcy court's final order or judgment, the bankruptcy court's conclusions of law are reviewed de novo. *In re Rowell*, 359 F. Supp. 2d 645, 647 (W.D. Mich. 2004). Issues of statutory interpretation are questions of law, and are thus subject to the de novo standard. *Kessler, Inc. v United States Trustee (In re Kessler),* 142 B.R. 796, 799 (W.D. Mich. 1992). The district court may affirm, modify, or reverse a bankruptcy's judge's judgment, order, or decree or remand with instructions for further proceedings. FED. R. BANKR. P. 8013.

"Rule 56 of the Federal Rules of Civil Procedures [sic] governs summary judgment motions in bankruptcy court adversary proceedings." *In re Rowell*, 359 F. Supp. 2d at 647 (citing FED. R. BANKR. P. 7056). A motion for summary judgment is properly granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A court may enter summary judgment sua sponte in favor of a nonmoving party so long as the losing party was on notice to present all desired evidence on the matter at issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)*; Salehpour v. Univ. of Tennessee*, 159 F.3d 199, 204 (6th Cir. 1998).

## III. Discussion

This appeal brings the Court to an uncertain intersection of bankruptcy law and securities law. *See Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir.

1999); *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S & L Ass'n (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 878 F.2d 742, 751 (3d Cir. 1989). At issue are provisions in the Bankruptcy Code providing for an exemption to avoidance for "settlement payments" in the securities trade, made by or to a financial institution pursuant to 11 U.S.C. § 546(e), which provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, *the trustee may not avoid a transfer that is* a margin payment, as defined in section 101, 741, or 761 of this title, or *settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of)* a commodity broker, forward contract merchant, stockbroker, *financial institution*, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A)[3] of this title. (Emphasis added.)

The Bankruptcy Code, 11 U.S.C. § 741,[4] defines "settlement payment" for purposes of § 546(e): "'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8).

The key question for decision is whether the term "settlement payment" as defined exempts the payments made in the LBO of Quality Stores, Inc., to acquire the privately held shares of stock. This is an issue of first impression in the Sixth Circuit. While other courts have addressed aspects

---

[3] Section 548(a)(1)(A) pertains to intentional fraudulent transfers and is inapplicable to this case.

[4] The definition in § 101(51A) applies to forward contract provisions under the Bankruptcy Code and is inapplicable to the circumstances of this case.

of this question, including whether the term "settlement payment" includes payments made in an LBO of a public company, and whether the term may include payment for privately held securities, the bankruptcy court's decision in this case charts new territory regarding the extent of the § 546(e) exemption.  Having fully considered the statutory language, and the legal and historical context of § 546(e), this Court is persuaded that no principled basis exists for denying application of the exemption in this case.

*Question of Statutory Interpretation*

This appeal presents an issue of statutory interpretation.  When interpreting a statute, courts must first consider the plain language of the statute, and resort to a review of congressional intent or legislative history only when the language of the statute is not clear.  *In re Comshare, Inc., Securities Litigation*, 183 F.3d 542, 549 (6th Cir. 1999).

> As with any question of statutory interpretation, we must first look to the language of the statute itself.  If the language of the statute is clear, then the inquiry is complete, and the court should look no further.  Only if the statute is "inescapably ambiguous" should a court look to other persuasive authority in an attempt to discern legislative meaning.  Persuasive authority can include other statutes, interpretations by other courts, legislative history, policy rationales, and the context in which the statute was passed.

*Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.,* 474 F.3d 365, 371-372 (6th Cir. 2007) (citations omitted).

*Background and*
*Purpose of the Section 546(e) Exemption*

Section 546(e) exempts from avoidance, either as preferences or fraudulent transfers under state law and federal bankruptcy law, certain transfers by debtors that meet the statutory requirements.  This exemption is an exception to public policy underlying the avoidance provisions in the Bankruptcy Code—intended to prevent a debtor from diminishing funds that are generally

6

available for distribution to creditors—in favor of a policy of maintaining stability in the securities market. *Kaiser Steel Corp. v. Charles Schwab & Co., Inc. (In re Kaiser Steel Corp.)*, 913 F.2d 846, 849 (10th Cir. 1990) ("*Kaiser I*"); *In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1181 (11th Cir. 1987).

The § 546(e) exemption effectively provides a "safe harbor" for certain types of transactions since its purpose is "'to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions.'" *Enron Corp. v. Credit Suisse First Boston Int'l (In re Enron Corp.)*, 328 B.R. 58, 66 (Bankr. S.D.N.Y. 2005) (quoting *Kaiser I*, 913 F.2d at 848). Congress enacted the "safe harbor" provisions of §546(e) to "'ensure that the avoiding powers of a trustee are not construed to permit margin or settlement payments to be set aside except in cases of fraud [by the purchaser].'" *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d at 751 (quoting H.R. Rep. No. 97-420 (1982) ("1982 House Report"), *reprinted in* 1982 U.S. Code Cong. & Admin. News 583, 583).

When first enacted in 1978, the exemption applied to only the commodities market.[5] *Kaiser I*, 913 F.2d at 848-849; *In re Enron Corp.*, 328 B.R. at 66 (2005). The commodities exemption was limited to margin payments to brokers and settlement payments from clearing organizations, and the term "settlement payment" was not defined. *Kaiser I*, 913 F.2d at 849. In 1982, however, Congress was concerned with the volatile nature of the commodities and securities markets, and "so former section 764(c) was replaced by sections 546(e) and 741(5) and (8) 'to clarify and, in

_____

[5] *See* 11 U.S.C. § 764(c) (repealed 1982). The exemption was a response to *Seligson v. New York Produce Exchange*, 394 F. Supp. 125 (S.D.N.Y. 1975), which held that a trustee could recover a margin payment made to a commodities clearinghouse. *Kaiser I*, 913 F.2d at 849 n.4 (citing White, *The Commodity-Related Provisions of the Bankruptcy Act of 1978*, 34 Rec. Bar. A. Bar City of New York 262, 269-271 (1979)).

some instances, broaden the commodities market protections and expressly extend similar protections to the securities market.'" *Kaiser I*, 913 F.2d at 849 (quoting 1982 House Report); *see also In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d at 747.  The 1982 amendments expanded the exemption to include margin and settlement payments to and from brokers, clearing organizations, and financial institutions.  *Kaiser I*, 913 F.2d at 849.

Thus, while the Bankruptcy Code gives broad powers to a trustee to avoid transactions involving preferential or fraudulent transfers that deplete the bankruptcy estate, the enactment of § 546(e) also acknowledges that avoidance of settled securities transactions could wreak havoc on the already volatile commodities and securities markets.  *Kaiser I*, 913 F.2d at 849; *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d at 751.  The "ripple effect" from a major bankruptcy affecting the commodities and securities markets could potentially displace many investments and threaten the solvency of many additional institutions.  *Kaiser I,* 913 F.2d at 849; *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d at 751.  In short, § 546(e) protects the nation's financial markets from the instability that would be caused by the reversal of settled securities transactions.  *Kaiser I,* 913 F.2d at 848.  It also creates the tension between these two areas of law that leads to the instant litigation.

While the purpose of the § 546(e) exemption is easily understood from a policy standpoint, it has proved far more difficult to understand in practical application.  Given the cross purposes of bankruptcy creditors and former shareholders or other prebankruptcy payment recipients, the § 546(e) exemption has become a battleground of semantics and legal frameworks as litigants and the courts attempt to establish its limits within the statutory language.  Despite numerous cases that have considered the statutory language and legislative history of §§ 546(e) and 741(8) in an

attempt to discern the Congressional intent, little has been gleaned to formulate any decisive standard to determine which transactions fall within the exemption.  Consequently, some 25 years after the enactment of the exemption from avoidance for settlement payments in the securities trade, the courts continue to be a forum for disputes over the construction of §§ 546(e) and 741(8). This case is a prime example of the search for a judicial resolution of the correct statutory application.

*Arguments*

The parties are diametrically opposed on issues of legal analysis as well as outcome. Plaintiffs argue that the § 546(e) exemption for settlement payments is limited to publicly traded securities and that Congress did not intend to exempt transactions such as an LBO of privately held stock because such payments are not "commonly used in the securities trade," as defined in § 741(8).  Defendants respond that the statutory definition of "settlement payment" has been broadly construed based on the plain language of the statute and that a substantial majority of circuit courts that have ruled on this issue have held that the § 546(e) exemption applies even when the securities are privately held and the centralized clearance system is not involved.

Plaintiffs further argue that the expansive view of the § 546(e) exemption advocated by the Third and Tenth Circuits, and followed by the bankruptcy court in this case, is erroneous in the context of this case, "a one-off private transaction involving privately-held stock."  They contend that the statutory definition of "settlement payment" is inherently ambiguous, which requires that the court look beyond the text to resolve the ambiguity and determine legislative intent. Defendants respond that, as the bankruptcy court reasoned, the plain meaning of the statutes is clear and unambiguous, and consideration of the legislative history is unwarranted; no further

inquiry by the court is necessary unless applying the plain language leads to an absurd result, which in this case it does not.

*Analysis*

In attempting to discern the limits of the § 546(e) exemption, the Court must first look to the statutory language.  Only if the statutory language is unclear is resort to a review of congressional intent or legislative history permissible.  *In re Comshare, Inc.*, 183 F.3d at 549.  "Only if the statute is 'inescapably ambiguous' should a court look to other persuasive authority in an attempt to discern legislative meaning."  *Brilliance Audio, Inc.*, 474 F.3d at 371-372 (citations omitted).  Nonetheless, even where the language of the statute is unambiguous, courts may still consider legislative intent if enforcing the words as written would lead to an absurd result:[6]

> [W]hile it is axiomatic that where the legislative scheme is coherent and consistent the court need not inquire beyond the text of the statute, in cases where the plain language, even if literally applicable, would yield absurd results at odds with the statutory design, courts may look beyond the printed word to the law as a whole and its purposes and policy, so as to determine what particular legislative intent may apply.

*Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406, 478 (S.D.N.Y. 2001).

Looking to the §741(8) definition of "settlement payment," it is beyond dispute that the statute lacks sufficient definition to determine precisely what constitutes a "settlement payment" in any specific context: "'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final

---

[6] Defendants question whether this standard remains valid in light of recent Supreme Court decisions, e.g., *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005), which they assert require federal courts to interpret statutes in accordance with the plain language and meaning without referring to legislative history or other extrinsic evidence.  This issue need not be resolved because, as discussed, *infra*, the application of the plain meaning does not lead to an absurd result in this case.

settlement payment, or any other similar payment commonly used in the securities trade."  11 U.S.C. § 741(8).  The courts have struggled to remedy this lack of specificity by applying various rules of construction or analytical frameworks to develop some logical approach to practical application of the definition.  Compare *Kaiser I*, 913 F.2d at 848 (the definition, while somewhat circular is "extremely broad" and clearly includes anything that may be considered a settlement payment) with *Official Comm. of Unsecured Creditors v. ASEA Brown Boveri, Inc. (In re Grand Eagle Cos., Inc.)*, 288 B.R. 484, 492 (Bankr. N.D. Ohio 2003) ("reflexive aspect of this provision, i.e., defining the meaning of 'settlement payment' by listing a variety of types of 'settlement payments,' requires the reader to consider extrinsic information and the final modifying phrase"); and *Official Comm. of Unsecured Creditors of Norstan Apparel Shops, Inc. v. Lattman (In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68, 76 (Bankr. E.D. N.Y. 2007) (the concluding phrase "or any other similar payment commonly used in the securities trade" modifies the definition of settlement payment "because in its absence of the concluding phrase, the statutory definition contained in § 741(8) would be, in effect, a meaningless tautology").

Absent clear statutory guidance concerning the extent of the § 546(e) exemption, two contrary views of the §546(e) exemption for settlement payments have evolved.  Under the broader view, the exemption includes any payment normally regarded as part of the settlement process because the plain language of the statute does not limit the exemption to transactions involving only publicly traded securities.  *See, e.g.*, *Jonas v. Resolution Trust Corp.* (*In re Comark*), 971 F.2d 322, 326 (9th Cir. 1992) (joining the Third and Tenth Circuits in broadly defining the term settlement payment to include transfers that are normally regarded as part of the settlement process); *Official Comm. of Unsecured Creditors of The IT Group, Inc. v. Acres of Diamonds, L.P.,*

*(In re The IT Group, Inc.),* 359 B.R. 97, 101 (Bankr. D. Del. 2006) ("the term settlement payment is to be applied broadly to any transfer of stock or cash to pay for stock," and the fact that the stock was sold privately rather than on the public stock market is not a distinguishing factor).

The contrary view, argued by plaintiffs, is that the settlement payment exemption is limited to publicly traded securities and that Congress did not intend to exempt transactions such as an LBO of privately held stock. *See, e.g., In re Norstan Apparel Shops, Inc.*, 367 B.R. at 75-76 (quoting *In re Adler, Coleman Clearing Corp.*, 263 B.R. at 478) (internal quotations omitted) ("while the term 'settlement payment' as used in § 546(e) 'is to be read broadly, the term is not boundless,'" and thus it must read to include only a transaction involving the public securities market).

In this case, the bankruptcy court adopted the former view and granted summary judgment for defendants on the basis that the definition of settlement payment in § 741(8) has been recognized as "extremely broad," and that the Tenth Circuit Court of Appeals, as well as other courts, have applied this broad definition of "settlement payment" to transfers of consideration made in connection with an LBO. *In re Quality Stores, Inc.*, 355 B.R. at 633 (quoting *Kaiser I*, 913 F2d. at 848 and citing additionally *In re Resorts Int'l, Inc.*, 181 F.3d at 515-516); and *In re Comark*, 971 F.2d at 326; *see also Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.) ("Kaiser II")*, 952 F.2d 1230 (10th Cir. 1991). This Court finds no error in the bankruptcy court's general reasoning and conclusion.

As the bankruptcy court noted, the Tenth Circuit has held that payments made to shareholders through their securities broker, Charles Schwab & Co., were "settlement payments" exempt from avoidance under § 546(e). *In re Quality Stores, Inc.*, 355 B.R. at 633 (citing *Kaiser*

*I*).  Further, in *Kaiser II*, the court extended its holding to include transfers made from the disbursing agent directly to individual shareholders.  *In re Quality Stores, Inc.*, 355 B.R. at 633.  And in both cases the Tenth Circuit relied on the definition of settlement payment found in § 741(8), concluding that the definition was intended to include any transfer that would be considered a settlement payment in the securities industry.  *In re Quality Stores, Inc.*, 355 B.R. at 633.  Because the securities industry generally defines settlement as "the completion of a securities transaction," *Kaiser I*, 913 F.2d at 849, interpreting "settlement payment" to include the transfer of consideration in an LBO is consistent with the securities industry definition of "settlement." *In re Quality Stores, Inc.*, 355 B.R. at 633-634.

Further, nothing in the plain language of the statutes limits the application of the exemption to public transactions.  As defendants point out (Df. Brief 16), decisions of the Fifth and Ninth Circuits have determined that transactions involving "repos" and forward contracts are subject to the § 546(e) exemption regardless whether the transactions involved public or private securities and whether the transactions would trigger the centralized clearance system if avoided by the trustee in bankruptcy.  *In re Comark*, 971 F.2d 322; *Williams v Morgan Stanley Capital Group, Inc. (In re Olympic Natural Gas Co.)*, 294 F.3d 737 (5th Cir. 2002).

Contrary to plaintiffs' arguments, the statutory language is not "inescapably ambiguous."

Merely because the statutory definition is broad does not render it ambiguous.  In defining what constitutes a settlement payment, Congress chose an inclusive, rather than exclusive definition. The statutory definition is more in the nature of a "catch-all," which leaves to the courts the task

of winnowing out those transactions that  do not comport with the statutory provisions or Congressional intent and thus lead to an absurd result.

In this case, there are no exceptional circumstances to depart from the generally accepted broad view of the term "settlement payment."  Given the plain language of the statute, the case law, and the circumstances of this case, the payments to defendants must be deemed to fall within the §546(e) exemption for a "settlement payment."  This Court finds no error in the bankruptcy court's conclusion that the payments made to defendants to effect the LBO are settlement payments as defined in § 741(8).

Plaintiffs nonetheless argue that even if the language is not ambiguous, it leads to an absurd result in this case, and thus should not be enforced.  "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'  In such cases, the intention of the drafters, rather than the strict language, controls." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242-243 (1989).  (citations omitted).  Plaintiffs contend that the bankruptcy court's decision leads to an unreasonable result by permitting shareholders to retain otherwise voidable payments and granting them priority over the creditors without effectuating Congress' intent of promoting stable financial markets.  (Pl. Brief 22.)  To do so, they argue, "conflicts with the Bankruptcy Code's design to augment property of the estate for the benefit of creditors and accord priority to the rights of creditors over the interests of equity security holders."  (*Id.*)

This Court finds no such infirmity in applying the exemption in the circumstances of this case.  The record reflects that one of the creditors seeking the benefit of avoidance in fact provided financing for the LBO of Quality Stores, and thus would have been fully aware of the financial

context of the LBO.  This undermines any argument that the equities rest with creditors as opposed to the approximately 170 shareholders, *In re Quality Stores, Inc.*, 355 B.R. at 631, many of whom are mid- and lower- level ESOT employee-shareholders, whose stock payments would be voided in favor of the creditors.

Moreover, plaintiffs provide no support for their contention that applying the exemption does not further Congressional intent to promote stability in the financial and securities markets.  Given the multitude of shareholders involved in this case, many of whom likely reinvested the proceeds, it is questionable whether the undoing of the hundreds of transactions would not cause some disruption in the securities market.

Finally, regarding plaintiffs' claim that the court erred in determining that the settlement payments were "transfers" made "by" a "financial institution," the bankruptcy court's reasoning and conclusion are likewise sound.  Plaintiffs have raised no persuasive basis for reversing the bankruptcy court's finding that the payments made to defendants were made "by … a financial institution" pursuant to §546(e), and thus protected from avoidance.  On appeal, as before the bankruptcy court, plaintiffs argued that the transfers at issue were not made "by … a financial institution" pursuant to § 546(e) because the disbursing agent never acquired a beneficial interest in the LBO consideration.  *Munford v. Valuation Research Corp. (In re Munford, Inc.)*, 98 F.3d 604 (11th Cir. 1996).  In *Munford*, a divided court found that the bank responsible for conveying payments was not a "transferee" because it never acquired a beneficial interest in the funds.  *Id.* at 610.  The holding in *Munford*, which requires that the disbursing agent acquire a beneficial interest in the LBO consideration for the § 546(e) exemption to apply, is not supported by the plain language of the statute.

This Court agrees with the bankruptcy court that although the result in *Munford* may be viewed as fair, there is no requirement in § 546(e) that a financial institution acquire a beneficial interest in the funds it handles for § 546(e) to apply.  Accordingly, the courts may not impose policy limitations not expressly stated in the statute.  *In re Quality Stores, Inc.*, 355 B.R. at 635-636.

To the extent that plaintiffs assert that upholding the exemption in this case creates the potential for widespread abuse of the § 546(e) exemption, this Court finds the concern overstated. Plaintiffs argue that the bankruptcy court's application of § 546(e) leads to an absurd result—the "unfettered ability of troubled companies to cash-out their shareholders before bankruptcy, to the detriment of the companies' creditors," which circumvents other provisions of the Bankruptcy Code.  (Pl. Brief 38).  In the absence of clear statutory guidance concerning the extent of the § 546(e) exemption, the courts have effectively resorted to a case-by-case determination of the merits of exemption.  The result is a spectrum of decisions finding transactions of varying types within the purview of the settlement payment exemption, while excluding others.  The result is a "broad, but not boundless" interpretation of the exemption by the courts.  *See In re Norstan Apparel Shops, Inc.,* 367 B.R. at 76; *In re Adler, Coleman Clearing Corp.*, 263 B.R. at 478.  And while the bankruptcy and securities systems, like any complex scheme, are targets for abuse, in those transactions in which such abuse seems evident, a statutory safety valve exists.  The courts have generally determined that, by definition, a settlement payment must be commonly used in the securities trade.  *Kaiser II*, 952 F.2d at 1237.  It is therefore unlikely that a transaction that is a clear abuse of the exemption could be said to be commonly used in the securities trade.  *See, e.g., Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.)*, 321 B.R. 527, 539, 541 (B.A.P.

9th Cir. 2005) (transactions in illegally unregistered securities are not "commonly used in the securities trade"). "[D]ecisions that involve outright illegality or transparent manipulation reject § 546(e) protection." *Id.* Accordingly, until such time as Congress deems it prudent or necessary to amend the statute, the courts will continue to winnow out those exceptional cases at the far end of the spectrum where the exemption is unwarranted.[7]

## IV. Conclusion

This Court finds no basis for reversal of the grant of summary judgment in favor of defendants. The plain language of the statute neither limits application of the term "settlement payment" to transactions involving only publicly traded securities nor does it exclude LBO payments. And there is no convincing support for plaintiffs' claim that enforcing the plain and unambiguous provisions of the statute conflicts with Congress' intent in enacting the statute and thus leads to an absurd result. "[G]iven the fact that disruption in the securities industry—an inevitable result if leveraged buy outs can freely be unwound years after they occurred—is also

---

[7] A series of cases in the Enron bankruptcy proceedings bears out the of the validity of this conclusion in practice. In four cases, the bankruptcy court, Arthur J. Gonzalez, J. applied the statutory framework to the facts of each case, reaching different results in determining whether the transactions qualified as settlement payments. *Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451 (Bankr. S.D.N.Y. 2006) (prepetition payments to acquire notes from trust in excess of value to protect credit rating were in the nature of settlement payments); *In re Enron Corp.*, 328 B.R. 58 (debtor's payment to acquire its own shares did not qualify as settlement payment); *Enron Corp. v. J.P Morgan Sec., Inc. (In re Enron Corp.)*, 325 B.R. 671 (Bankr. S.D.N.Y. 2005) (whether payments made for short term commercial paper before maturity date, at significantly above-market prices and contrary to the offering documents, were settlement payments was a factual issue requiring trial); *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857 (Bankr. S.D.N.Y. 2005) (payment made to acquire own shares when debtor was insolvent or rendered insolvent by the transaction would not qualify as settlement payment).

a harm the statute was designed to avoid," no absurd result occurs.  *Kaiser II,* 952 F.2d at 1241.

The statute must be enforced in accordance with its plain language.


DATED: December 21, 2007          /s/ Janet T. Neff_____
                                  JANET T. NEFF
                                  United States District Judge